final case on the calendar. I'm not sure whether it's pronounced Arce or Arce v. Honeywell. Good morning, Your Honors, and may it please the Court. My name is Barbara Cowan, and I represent the appellate in this case, Linda Arce. Linda Arce took numerous steps to prevent Honeywell from making a false claim for payment to the United States government. Ms. Arce remains steadfast on the importance of delivering a safe and competent product to the government, which would be used in several Boeing aircraft, including Air Force One. In fact, Boeing representatives even stated that Ms. Arce should not be pressured to sign off on a product that was not ready for final delivery. The specific item that she was trying to prevent from being falsely submitted to the government was software aviation, which would have certified that it was FAA compliant, meaning that it met all rules for FAA certification, which was a requirement under the contract with Boeing and Honeywell. Did she ever mention the word fraud or identify the fraud that she was trying to prevent, or is that not necessary to engage in protected conduct? Thank you, Judge Tunheim. She did not mention – she did not specifically state the word fraud, but she is not required to. Under this Court's precedent, and specifically in Mooney v. Fife, which was decided in September of 2024, the Court here, the Ninth Circuit, rejected the investigatory requirement, which was previously mentioned under Hopper. And specifically in this case, the district court decided this motion for summary judgment solely on the investigating fraud component. But the statute is clear in its post-2009 amendments. The statute says that a protected employee can be investigating fraud or take steps to prevent a false claim from being made to the United States government. That's sort of beside the point, because what she has to be trying to prevent – well, first of all, it doesn't say prevent. It doesn't. It says to stop a false claim. And in all cases, from what I can see, there was – they had some knowledge that claims were being falsified. Here, there's no such – it's all completely projected into the future, right? I mean, she's essentially – she's not saying that she knows that they have ever actually submitted a false claim. Correct. But that's not – And that's different from all the other cases. Well, in this case, Your Honor, that's not required. And specifically, I would point to, in the record, the email that she sent to her supervisors on April 16, 2019, which is at page 484 of the record. In this email, Ms. Arce specifically told her supervisor that she was relaying issues detected with the release of certification data items that contractually, Honeywell is required to adhere to in the release of avionic product software. And in this case, Ms. Arce linked the fact that she was preventing the certification from occurring with the fact that Honeywell was required to contractually deliver an FAA-compliant software product per the terms of the contract. That's in her April 16, 2019 email. It's also in her May 2019 notice of grievance. It's also in her declaration, which is at the record. Any allegation that they were going to file a piece of paper certifying this as being compliant when it wasn't or that they had, certainly not that they had. So the – and then there's a knowledge component, right, where they have to know that it was not – because it's a fraud claim. So it has to be that they know it isn't true. And if they think it is true but she thinks it isn't true, that doesn't do it either, right? Well, under the statute, Your Honor, and under the case law, if she's stopping a claim from being made or taking steps to do that, she does not have to know that they are absolutely committing fraud. That's not the standard. The standard is whether she believed it, which the record is that she did in her declaration in the record at pages 969 to 970, and also that an objective person would believe. Well, she believed this was uncompliant, but she didn't believe they were certifying it because they hadn't certified it. But they – she refused to sign off on it. That was the only reason they hadn't certified it. They didn't certify it during her employment because she refused to sign off on it. And Boeing, for the objective factor, Peter Marflit from Boeing, specifically said that Ms. Arce should not be pressured to sign off on something just to meet a contractual deadline. And in this case, that's exactly what was happening. And then what occurred is that after Ms. Arce was – after the decision had been made to terminate her and after she was forced onto FMLA leave, then all of the products that she refused to certify were, in fact, certified. And in this case, we know that a reasonable employee in Ms. Arce's position would have believed that fraud was happening because here there was an explicit refusal by her to sign off on noncompliant software that prevented funds from being dispersed. In her declaration that was submitted, which was not objected to nor refuted, she stated, I was pressured by Honeywell to approve or sign off on software products targeted for production so that Honeywell could deliver this product and thus be paid from the government contract Boeing is the supplier on. In this case, Ms. Arce, on six different occasions, she submitted CARs, which are corrective action reports, which were external, meaning Boeing was able to see them as the customer. Ms. Arce, in February of 2018, her performance review stated that she met all standards at Honeywell and she was actually slated for promotion. And then that next year, she refused to sign off on a product because she knew her signing off on it would trigger the Category 1 milestone under the contract and would thus trigger payment from the government contract to Honeywell. That is what she stopped. And specifically under the statute, under 31 U.S.C. 3730 subdivision H1, it does not require that an employee be acting outside of a compliance role. The statute protects any employee, not just those in noncompliance role. Here, between six times, between December 2017 and July 2019, Ms. Arce took action to prevent the software from being approved. Because if she approved it, if she signed off that this was FAA certified, then that would trigger the payment under the Category 1 milestone under the contract. And that is what she stopped and that is what she sought to prevent. It's clear that she was concerned about safety issues. Compliance with the safety requirements, I think, was part of her job. I'm trying to figure out how that extends to the fraud argument when she was simply reporting and refusing to sign, certainly because she was concerned that it wasn't technically compliant and would cause safety violations. Yes, Your Honor. And I think that in this case, the argument to that is that she at times categorized it as safety issues. And the reason for that is that she is an engineer. And in her statement and in the cars, what was happening was that the software code was not regenerating from the source code. And the reason that is a safety concern is that, number one, FAA requirements, to be FAA certified, it must occur. The reason for that is that in an emergency, that is the backup system in the aircraft. So that is why at times she referred to it as a safety concern, is that if an aircraft is having a problem in air, the software code needs to automatically regenerate from the source code to prevent a catastrophic event happening in aviation. And that is why at times she referred to it as a safety concern. But the testimony of Paul LaPietra, one of her supervisors, on pages 749 and 750 of the record, makes clear that this is, number one, a major issue. That is his testimony that it is a major issue. And that specifically the objectives of DO-178, which was an industry guideline, which if met, meant that FAA certification was automatic. That is the reason that she categorized this safety issue and why it falls under fraud. It is because if she says, yes, this software code regenerates, it meets all FAA rules, and therefore is FAA compliant, that triggers the payment under the government contract. Counsel, I am looking at paragraph 6 of her declaration on ER 970. I was pressured by Honeywell to approve sign-off on software products targeted for production with regulatory compliance issues for the P-8AMMA aircraft so that Honeywell could deliver the product and thus be paid from the government contract Boeing is the supplier on. So in your view, does her discussion there of regulatory compliance issues sufficient to bring this within the ambit of the anti-retaliation provisions of the FCA? Yes, it is, Your Honor, because the FCA specifically states that any employee is protected. No, I know that any employee is protected, but it has to do with what it is you're trying to stop. Yes, Your Honor, because if the software was not compliant, then that prevented government funds from being distributed. And that is precisely what the Boeing supplier, Peter Marflett, told her supervisor, is that she should not be pressured to sign off on something just to meet the deadline. And it is that regulatory compliance that, as Honeywell currently is allowed to self-certify that it is FAA compliant. So regulatory compliance in this context equals FAA certification. And it equals, in your view, fraud. Yes, Your Honor, because if she signed off on this saying that this avionics software was FAA compliant and it was not, that triggers a payment under the contract based on a fraudulent premise. Isn't the question how closely connected her actions have to be to any potential fraud? As I said before, as far as I can tell in all the other cases, there was actual the person at least believed that there was actual ongoing fraud. And she was trying to stop something that was already happening. Right here, I mean, there are various, this is kind of interesting, but there are various steps. I mean, before there would be an actual fraud, at the time she was doing this, there was no certification. You didn't know what they were going to say, whether Honeywell was going to actually certify it. You didn't know whether Boeing was going to certify it. Boeing was the one that actually had to do the certification because Boeing was dealing with the government, not Honeywell. Right? So the question really, to me, I mean, I think you're right that there's some probability that this was going to happen, but it never had happened, and it might not, very much might not happen. And is that enough? That's really the question, given the fact that there's no, there was no belief of fraud having ever occurred or even being about to occur. Your Honor, the standard under Mooney is whether a reasonable employee might possibly believe that some fraud is occurring. Right. That's different. That's entirely different. That's what I'm trying to say. In Mooney, there's no question that the employee testified as to he thought it was fraud. Right? I think there was some testimony based on the opinion, though, it was really the underbilling and the overbilling that was the issue. And here But the sentence you wrote is completely contrary to what you're saying. Because, you read, I mean, because the whole problem here is that there was no belief that fraud is occurring. It's that it might occur in the future. Your Honor, it was that if she certified this, that was going to trigger the Category 1 milestone under the contract, which triggers the payment to Honeywell. And that is the fraud. But it doesn't come within the language of Mooney. Respectfully, it does, Your Honor, because she's saying that if this, if she certifies this, Honeywell gets paid under the contract. That's what her supervisor, Mr. Teague, told her that's also in the declaration, and that is what she was trying to stop from occurring. And that is what's protected under the FCA. And I'd like to reserve the balance of my time. We'll give you a couple of minutes, Counsel. Thank you, Your Honor. Good afternoon. May it please the Court. My name is Leah Freed. I am counsel for Honeywell International. The district court's dismissal of appellant Linda Arce's claims under both the False Claims Act and the Family and Medical Leave Act can be upheld on the record before this court. There are multiple and alternate grounds for dismissal of each of Arce's claims. I want to briefly address the Mooney v. Fife case, which was issued 10 days after Honeywell submitted its answering brief in this appeal. I would submit that the elements of the prima facie case upon which Ms. Arce bears the burden remain the same under the Mooney case. But the district court's analysis was wrong under Mooney. I agree with that, Your Honor. In light of the Mooney decision, you cannot uphold the district court's decision on the very same basis. But on this record, there are several alternate bases upon which you can affirm. What Mooney did affirm is that the McDonnell-Douglas burden-shifting as standard applies to FCA claims. Mooney also clarified that efforts to stop an FCA violation are protected activity. Third, Mooney adopted the standards set forth in Moore v. California Institute of Technology Jet Propulsion Lab for protected activity, meaning there's both a subjective standard that Ms. Arce had to believe there was possible fraud and, objectively, that a reasonable person would need to believe there may be fraud, meaning a fraudulent payment to be made to the government. And the language of the suggestion is kind of odd. It's just stop a violation. Presumably that means the violation doesn't yet have to have occurred if you're going to stop it, right? So why isn't Ms. Cowan's analysis right, that she was trying to prevent a certification because she knew that the certification would lead to the request for payment from the government based on a false statement, i.e. that there was compliance? Your Honor, I would say two things are missing from this record. The first is that Ms. Arce believed that there was possibly a fraudulent request for payment to the government. Well, not yet. But she believed that it would ineluctably flow from her certification. And, Your Honor, what I would point to is the fact that there's nothing in this evidence to cite to any statement by Ms. Arce about any payment whatsoever. Today, her counsel has mentioned her affidavit and the fact that there's reference to a milestone. First, that was never identified by Ms. Arce during the numerous complaints she made over a four-year period. Second, her declaration is not cited in her brief opposing the motion for summary judgment. If you look at the record at page 728, she makes no reference to fraudulent payments whatsoever. But it was inherent in the situation. I mean, there was a contract. The contract said that they had to agree they had to follow the regulatory standards, and if they submitted a certification, they would get paid. But, Your Honor, there were multiple certifications. There's nothing in this record that any certification that she was filing noncompliances on was contingent to any milestone. The record is devoid of any of that evidence. What does that mean? I don't even know. That there's no evidence. What do you mean by milestone? You mean a point at which they would ask for payment? Well, what Ms. Cowan just presented to this panel was that there is an affidavit that was never cited in the motion for summary judgment response that indicates she believed there was a milestone related to this certification. What does a milestone mean? A milestone means within the contract there are certain timelines and deadlines to be made. Those are milestones, deadlines. But it's not related to payment? It's not that once you reach a milestone, you get paid? I don't know. I apologize. Once you reach a milestone, do you get paid? There's nothing in this record on that, Your Honor. Okay. So the milestone doesn't seem pertinent. So the question is, is it simply inherent? I mean, do we know from this record that the certification was a requirement to get paid eventually? Not in the record before the district court, Your Honor. I would also distinguish the Mooney case from this case on some of the aspects that Your Honor has already identified. First, in Mooney, that was a situation where the employer was billing directly to the U.S. government. Inherent in a claim of improper billing is reference to a fraudulent payment. In Mooney, the plaintiff also complained that the employer's billing activities created, quote, a significant legal liability risk. This put the employer on notice as to fraud. And with respect to causation, that employee was terminated within days of the protected activity and the plaintiff established pretext in this case. None of these facts are present on the record for this appeal. We've already spoken about the fact that Ms. Arce cannot make an objective showing or a subjective showing that she believed there were fraudulent payments to be made. Counsel, I want to go back to one of Judge Rezan's questions. Yes. When I'm looking again, and at this point I don't necessarily find it relevant that this was cited to the district court, but I'm looking at page, again, paragraph 6 of her declaration. I was pressured to sign off regulatory compliance issues so that Honeywell could deliver the product and thus be paid from the government contract. So, I mean, I think a fair reading of that is that I'm complaining about something that's a prerequisite to our getting government money. I have two responses to that, Your Honor. The first is, as to Judge Rezan's point, there's no record here as to how many steps removed that compliance argument is from payment. Second, I would argue it is relevant. Isn't that the key legal question here? How many steps removed does it have to be? Because, and which the parties really haven't engaged in very much because you keep worrying about whether she said the word fraud, which doesn't seem terribly pertinent. And the opponents say, well, it was going eventually to lead to a fraudulent action if they ever got paid. So it's different from the other cases because in the other cases there was the perception, at least, that fraud was going on. Here it hadn't gone on yet, but the language says stop a violation. So why isn't that good enough? I think it goes to two elements, Your Honor. First is that there's this objective standard that one would need to know that she's, that an objective person looking at the situation would believe there's a possibility of fraud. If it's 100 steps removed. Well, why wouldn't, a possibility in the future, not yet. Why isn't there? Because as the record shows in this case, the CAR process, the raising noncompliance is a step in the business. It's something they do all the time. This is a very common practice. And so the issue here goes to notice as well, which Mooney says the employer has to be aware of the efforts to stop an FCA violation. Not merely the raising of an issue, an effort to stop what would be an FCA violation. So in the regular course of business, raising issues that you don't think that something is compliant with an industry standard is not the same as alleging there is fraud or putting the employer on notice that I'm attempting to stop fraud. So are you saying that right now, and I'm not disagreeing with that, but that there's nothing in the record that details in any way the steps between the alleged regulatory compliance problem that Ms. Arce was talking about in her declaration and her deposition testimony? How many steps removed that would be, especially given that there's an intermediary company involved between that and payment by the government or the submission of something that is a false claim to the government? That's correct, Your Honor. And what Ms. Arce's counsel will point back to is her declaration making vague statements about the fact that ultimately we must certify the software such that Boeing will pay us on the contract. But the district court was not required to comb through the record to find that declaration and pick out that paragraph when it was not cited. But putting the ---- Well, I mean, that's a very technical argument. Suppose ---- But putting ---- Whether he was required or not, it is in the record and we're looking at it. So let's assume we're looking at it. Then what? Then her statement makes a very broad allegation that at some point that Honeywell has to certify its products and, to Judge Bennett's point, that Boeing must accept those certifications and then Boeing must decide to present itself to the government for payment. So I take it you have at least two points on this. Putting aside subjective, that that doesn't meet the objective, even in the light most favorable to Ms. Arce, that doesn't meet her objective component. But also for retaliation, even looking at the evidence in the light most favorable to her, that that doesn't mean that that's the way the employer would have perceived it. Exactly, Your Honor. And I would also raise to the Court there are two remaining elements of ---- Is there actually any question that this is true? I mean, that it's true that if she ---- if they improperly certify something and then get paid for it, and is there any doubt that they have to certify ---- they have to tell the government that there were proper certifications? Do we know that? What we know is that at some point Honeywell must certify to Boeing that it's delivered on its contract. There is nothing in this record about ---- And the contract includes compliance with regulations. Right, both. And she says that there wasn't compliance with the regulations. What she says is during the process by which she raises noncompliance, she argued repeatedly that a certain software was not compliant with industry standards. Okay. As part of the normal process for the car process, yes. And putting aside whether she can meet the first two elements of her claim, whether she can establish protected activity and notice, Honeywell would also argue that she fails to establish causation. As Ms. Cowan presented to the Court, Ms. Arce had raised the issue, the very same issue, this regeneration of source code for the P-8 MMI, over a period of four years beginning in 2017. The cards presented by Honeywell in the record show they go back even further to 2015. She was terminated nearly two years after her last alleged protected activity, and she was terminated after not returning to work after an 18-month leave of absence. There's no evidence in the record to dispute the testimony of Honeywell's terminated solely based on the leave of absence policy. Well, what about the termination summary that was prepared, allegedly two years earlier, which wasn't disclosed? What does a termination summary mean? A termination summary is a document used to recommend termination that goes through the legal process. It's a privileged document that was disclosed to Ms. Arce during the discovery period in this case. The testimony on the record that's undisputed is that termination decision was only a, that the termination summary was only a recommendation and there was no termination decision made at the time of that recommendation. That's at the record at page 804. But that was much closer to the time when she was allegedly making these complaints, correct? It was, and it related to the performance improvement plan. But the undisputed record evidence is there was nothing done with that termination summary. And that nearly two years later, when Ms. Arce failed to return from a leave of absence, she was terminated consistent with a written policy. That's in the record. Didn't she claim she did try to return, but nobody returned her calls or something like that? She claims that, but there's no evidence in the record to support that she stated her ability and interest in returning to work. What is in the record is that following her leave of absence, she communicated through two separate counsel, and that she did not have knowledge of what they shared with Honeywell about her ability to return. And she testified she, let me get the record sites for you, that she did not provide Honeywell with a release to return to work, and she had no evidence that she had been released to return to work by her physician. So we believe that the plaintiff cannot meet her burden under the McDonnell Douglas burden-shifting standard to dispute Honeywell's proffered reasons for her termination. And for these reasons ---- And if we decided that, we wouldn't have to decide any of the rest of it. Correct. On any of those elements, on causation or on pretext. I believe I'm about out of time. Are there any other questions? No. Thank you. Thank you. We'll give you two minutes, counsel. Your Honor, I'd like to make three points. First ---- What about the causation issue? Yes, Your Honor. With respect to the causation issue, number one, the evidence in the record on page 805 is that the termination summary was presented or was created, excuse me, in late June or early July of 2019 in preparation for the end of the PIP process. In February of 2018, before Ms. Arce engaged in any protected activity, she was actually recommended to be terminated based on her last performance review at Honeywell, and that's in the record at page 691. With respect to causation ---- Before she engaged in any protected activity? I'm sorry? Before she engaged in any protected activity. Yes, Your Honor. The protected activity in this case is not just the submission of cars. The protected activity in this case is initially ---- Well, she was recommended to be terminated before any protected activity. Doesn't that prove it wasn't causation? No, no, no. I'm sorry, Your Honor. She was recommended to be promoted before any protected activity.  Thank you. With respect to the protected activity in this case, that is the submission of cars, which there was the submission of cars, and then there was much more beyond that. This wasn't just the normal course of business. We have her April 16, 2019, email where she's being told to sign off on something even though she hasn't reviewed it, and that, quote, we will stay on the phone until you do. There's the April 19, 2019 notice of concern sent to her manager and human resources saying she feels she's being retaliated against and specifically tying the retaliation to refusing to certify something that they are contractually required to provide. There's the May 2019 notice of grievance, again, to her supervisor in HR. There's the July 1 letter from her attorney. Those are not the normal course of business. She went above and beyond, and so for that reason, we request that the summary judgment be reversed. Okay, we thank counsel for their arguments. The case just argued is submitted, and with that, we are adjourned for the day. All rise.
judges: BERZON, BENNETT, Tunheim